# In the United States Court of Appeals for the Fifth Circuit

State of Texas,

*Plaintiff - Appellant,*

*v.*

Kristi Noem Secretary, U.S. Department of Homeland Security; United States Department of Homeland Security; Kika Scott, Acting Director of U.S. Citizenship and Immigration Services; United States Citizenship and Immigration Services; Donald J. Trump, President of the United States,

*Defendants - Appellees.*

On Appeal from the United States District Court for the Southern District of Texas

## Appellant's Brief

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Ralph Molina
Deputy First Assistant Attorney General

Ryan D. Walters
Deputy Attorney General for Legal Strategy

Ryan G. Kercher
Chief, Special Litigation Division
ryan.kercher@oag.texas.gov

Zachary L. Rhines
Special Counsel
zachary.rhines@oag.texas.gov

Office of the Attorney General of Texas
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548

Counsel for Plaintiff - Appellant

STATE OF TEXAS

*Plaintiff - Appellant,*

*v.*

KRISTI NOEM Secretary, U.S. Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KIKA SCOTT, Acting Director of U.S. Citizenship and Immigration Services; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; DONALD J. TRUMP, President of the United States,

*Defendants - Appellees.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellee, as a governmental party, need not furnish a certificate of interested persons.

/s/Ryan G. Kercher
RYAN G. KERCHER
Special Counsel

## Statement Regarding Oral Argument

Appellant does not believe that oral argument is necessary to resolve this case. Nonetheless, if the Court finds that oral argument will be helpful, Appellee requests to participate.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ..................................................................ii

Statement Regarding Oral Argument ...........................................................iii

Table of Authorities ....................................................................................vi

Introduction ................................................................................................. 1

Statement of Jurisdiction ............................................................................. 3

Issues Presented .......................................................................................... 3

Statement of the Case .................................................................................. 3

    I.   Statutory Background ....................................................................... 3

    II.  Regulatory Background..................................................................... 6

    III. Texas's Costs under the 2022 Rule .................................................. 8

         1.   Driver's Licenses ................................................................. 9

         2.   Incarceration ....................................................................... 9

         3.   Education .......................................................................... 10

         4.   Healthcare ......................................................................... 11

    IV. Proceedings in the District Court.................................................... 12

    V.  Proceedings on Appeal ................................................................... 13

Summary of the Argument........................................................................... 14

Standard of Review ..................................................................................... 14

Argument..................................................................................................... 15

    I.   Texas has traditional Article III standing. ..................................... 15

        A.  Standing requirements ...................................................... 15

    B.   Texas has suffered a concrete and particularized injury..................... 16

        1.   The district court required evidence for standing that the Fifth Circuit has held to be unnecessary. .................................... 17

    C.   The district court committed clear error by failing to consider undisputed evidence that the Final Rule will injure Texas.................20

    D.   Texas's injury meets the traceability and redressability requirements for Article III standing. ................................................ 23

Conclusion......................................................................................... 25

Certificate of Service.......................................................................... 25

Certificate of Compliance .................................................................. 26

# Table of Authorities

Page(s)

**Cases**

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ............................................................. 23

*Cook Cty. v. Mayorkas,*
    340 F.R.D. 35 (N.D. Ill. 2021) ........................................ 22

*Cook Cty. v. Texas,*
    37 F.4th 1335 (7th Cir. 2022) ........................................ 22

*Cook Cty. v. Wolf,*
    962 F.3d 208 (7th Cir. 2020) ............................................. 4

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ...................................................... 23, 24

*Texas v. Biden,*
    20 F.4th 928 (5th Cir. 2021) ................................... passim

*Texas v. Biden,*
    554 F.Supp.3d 818 (N.D. Tex. 2021) ............................ 18

*Texas v. Cook Cty.,*
    143 S. Ct. 565 (2023) ....................................................... 22

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) ......................... 2, 19, 20, 22

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015), as revised (Nov. 25, 2015) ................................. 15

**Constitutional Provisions & Statutes**

8 U.S.C. § 1182 ...................................................................... 1

8 U.S.C. § 1182(a)(4)(A) ..................................................... 3

8 U.S.C. § 1182(a)(4)(B)(i) ................................................. 5

8 U.S.C. § 1182(a)(4)(C) ........................................................5

8 U.S.C. § 1183a(b)(1)(A) ......................................................5

8 U.S.C. § 1601(1)..................................................................5

8 U.S.C. § 1601(2) ............................................................. 1, 5

8 U.S.C. § 1601–§ 1646 ........................................................ 4

8 U.S.C. § 1611(c)(1)(B).........................................................4

8 U.S.C. § 1621(c)(1)(B) ........................................................ 4

Farm Security and Rural Investment Act of 2002,
    Pub. L. No. 107-171, § 4401, 116 Stat. 134 (2002) ............................................. 4

Illegal Immigration Reform and Immigrant Responsibility Act,
    Pub. L. No. 104-208, 110 Stat. 3009 (1996) ........................................5

**Rules & Regulations**

8 C.F.R. § 212.21(a) ...................................................... 6, 8, 17

8 C.F.R. § 212.21(b) ......................................................7, 8, 17

8 C.F.R. § 212.22(a) ...............................................................7

8 C.F.R. § 212.22(b) ...............................................................7

8 C.F.R. § 212.22(c) ...............................................................7

Field Guidance on Deportability and Inadmissibility on Public Charge
    Grounds,
    64 Fed. Reg. 28689 (May 26, 1999) ...................................... 6

Inadmissibility on Public Charge Grounds,
    84 Fed. Reg. 41292 (Aug. 14, 2019)............................... 6, 7, 8

Public Charge Ground of Inadmissibility,
    87 Fed. Reg. 55472 (Sep. 9, 2022) ...........................passim

## INTRODUCTION

Federal immigration law forbids admitting aliens who are "likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4)(A). In 2022, after notice and comment, Appellees adopted a Final Rule (the "2022 Rule") that robs this restriction of much of its force by (1) failing to take non-cash benefits into account when determining whether an alien "is likely at any time to become a public charge," (2) being primarily concerned with making sure that aliens receive public benefits, rather than "rely[ing] on their own capabilities and the resources of their families, their sponsors, and private organizations," in direct violation of 8 U.S.C. § 1601(2), and (3) empowering sponsors of family-sponsored aliens to submit false support affidavits. The effect of these changes is to relax the restriction Congress created on the admission of migrants susceptible to welfare dependency.

On January 5, 2023, Texas sued to enjoin Defendant-Appellees from applying the 2022 Rule, asserting that the 2022 Rule violated the Administrative Procedure Act ("APA"). To demonstrate standing, Texas showed that the 2022 Rule injures the State by burdening its public services. Because the Rule adopts a more restrictive definition of "public charge," it will result in more aliens being admitted into Texas. The resulting increase in indigence will impose significant costs on Texas. Defendants themselves admit the very purpose of the 2022 Rule is to encourage already admitted aliens to enroll in benefits programs, *see* 87 Fed. Reg. 55505, and their preamble to the 2022 Rule published findings that the Rule would increase the costs of providing benefits to aliens, leaving no room for dispute that Texas's public benefits system will suffer additional strain. 87 Fed. Reg. 55620–21; 55629–31.

Texas bolstered its standing arguments with statistical evidence comparing applications for alien status adjustments before and after the year Appellees' previous public charge rule (the "2019 Rule") took effect. Because the 2022 Rule reverts the definition of "public charge" to one that is more stringent than the 2019 Rule, and because the data show a significant decline in applications following the more inclusive 2019 Rule, those statistics support the conclusion that the 2022 Rule will lead to an increase in status adjustments, which translates into larger numbers of admitted aliens and accordingly additional costs to the State .

The district court nonetheless granted summary judgment to Defendants and dismissed all Texas's claims, ruling that Texas lacked standing to challenge the Rule under the APA. In its opinion, the lower court faulted Texas for not sufficiently proving that an increase in aliens has occurred or is imminent for Article III purposes: "Texas has not provided any evidence that a single additional person was, or would be, granted admission into the country, much less Texas, under the 2022 Rule as compared to the 2019 Rule . . . [and thus] failed to meet its burden of proving an injury in fact." ROA.814.

But this Court has rejected arguments that Texas must provide individualized evidence when challenging large-scale federal policies. *See Texas v. Biden (MPP)*, 20 F.4th 928, 971 (5th Cir. 2021) (holding "large-scale statistics and figures" can prove up standing to challenge "large-scale polic[ies]" and finding "Texas's standing is robustly supported by just such big-picture evidence"); *Texas v. United States*, 40 F.4th 205, 217 n.6 (5th Cir. 2022) (similar). Because the district court's basis for

rejecting Texas's standing conflicts with this Court's binding precedent, Texas respectfully asks that the Court reverse the judgment of the district court.

## STATEMENT OF JURISDICTION

Jurisdiction lies pursuant to 28 U.S.C. § 1291 and Federal Rule of Appellate Procedure 3 because the instant case is a direct appeal of a district court's final judgment.

## ISSUES PRESENTED

The issue presented is:

1. Whether the State of Texas has standing to challenge a 2022 Rule limiting the definition of a "public charge", when it showed evidence of:

    a. the total numbers of applicants for adjustment of immigration status both before and after the 2019 Rule that the 2022 Rule replaced; and

    b. evidence from Defendants' own rulemaking that the 2022 Rule replacing the 2019 Rule would increase States' costs in providing benefits to aliens.

## STATEMENT OF THE CASE

### I. STATUTORY BACKGROUND

The Immigration and Nationality Act (the "INA") states "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A).

In 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, also known as the "Welfare Reform Act," 8 U.S.C. §§ 1601–1646 (Pub. L. 104-193, 110 Stat. 2105). The Welfare Reform Act restricted aliens' access to federal benefits. It broadly defined "public benefits" to include in-kind benefits, including "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency" of, or funds appropriated by, federal, state or local governments. 8 U.S.C. §§ 1611(c)(1)(B), 1621(c)(1)(B). The Act also added a waiting period for alien status adjustment by "restricting most noncitizens from eligibility for many federal and state public benefits. It grants lawful permanent residents access to means-tested public benefits only after they have spent five years as a lawful permanent resident." *Cook Cty. v. Wolf*, 962 F.3d 208, 225 (7th Cir. 2020) (citing 8 U.S.C.§§ 1611, 1613, 1621).

These restrictions applied broadly. The only exceptions Congress provided for "emergency medical assistance; immunizations and testing for communicable diseases; short-term, in-kind emergency disaster relief; various in-kind services such as short-term shelter and crisis counseling; and certain housing and community development assistance." *Id.* (citing 8 U.S.C.§§ 1611, 1613, 1621). Later amendments would also lift the five-year waiting period for certain specified categories of immigrants. *See* Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, § 4401, 116 Stat. 134 (2002). Appellees have acknowledged the limited nature of these exceptions. 87 Fed. Reg. at 55,498–99.

These restrictions were intended to promote the "self-sufficiency" of foreign arrivals. 8 U.S.C. § 1601(1). The Welfare Reform Act began with a description of "the immigration policy of the United States" that "(A) aliens within the Nation's border not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organization, and (B) the availability of public benefits not constitute an incentive for immigration to the United States." *Id.* at § 1601(2).

Contemporaneous with the Welfare Reform Act, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996) ("IIRIRA"). The IIRIRA amended the INA by requiring, for the first time, that consular officers or the Attorney General utilize an itemized list of factors to make public charge determinations. *See* 8 U.S.C. § 1182(a)(4)(B)(i) ("the consular officer or the Attorney General shall at a minimum consider" the alien's age; health; family status; assets, resources, and financial status; and education and skills).

The IIRIRA also added a provision rendering family sponsored aliens inadmissible on public charge grounds unless the sponsor executes an "affidavit of support described in [8 U.S.C. § 1183a] with respect to such alien" *Id.* § 1182(a)(4)(C). This support-affidavit requirement authorizes federal officials as well as state and local governmental officials to demand reimbursement from the family sponsor for means-tested public benefits received by the sponsored alien. *Id.* § 1183a(b)(1)(A).

## II. Regulatory Background

Despite Congress's firm intent to ensure admitted aliens "not depend on public resources to meet their needs" and broadly defined "public goods," in 1999, shortly after enacted of the Welfare Act and IIRIRA, the Immigration and Naturalization Service adopted administrative guidance for consular officials defining a public charge as a noncitizen who is "primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense." Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28689 (May 26, 1999) ("1999 Field Guidance"). The Field Guidance excluded aliens who strongly depended on public benefits but whose dependence fell short of "nearly complete." The Guidance further instructed officers "not [to] place any weight on the receipt of non-cash public benefits (other than institutionalization) or the receipt of cash benefits for purposes other than for income maintenance." 1999 Guidance, 64 Fed. Reg. at 28,689.

In 2019, the Department of Homeland Security ("DHS") tightened its definition of "public charge," issuing a rule called "Inadmissibility on Public Charge Grounds," 84 Fed. Reg. 41,292 (Aug. 14, 2019) ("2019 Rule"), and superseding the 1999 Field Guidance. *Id.* at 41,292.

The 2019 Rule defined "public charge" as "an alien who receives one or more public benefits, as defined in paragraph (b) of this section, for more than 12 months in the aggregate within any 36-month period." 84 Fed. Reg. at 41,501 (adopting 8 C.F.R. § 212.21(a)).

The 2019 Rule also adopted a "totality of circumstances" approach to public charge determinations. 84 Fed. Reg. at 41,502 (adopting 8 C.F.R. § 212.22(a)). ("determination of an alien's likelihood of becoming a public charge at any time in the future must be based on the totality of the alien's circumstances by weighing all factors that are relevant"). Among the factors to be considered were an alien's age; health; family status; assets, resources, and financial status; and education and skills, as required by 8 U.S.C. § 1182(a)(4)(B)(i). *Id.* at 41,502–04 (adopting 8 C.F.R. § 212.22(b)). It also assigned positive and negative weights to a list of factors. *Id.* at 41,504 (adopting 8 C.F.R. § 212.22(c)).

Finally, the 2019 Rule defined "public benefits" to include any federal, state, local, or tribal cash assistance for income maintenance, Supplemental Nutrition Assistance Program (SNAP) benefits, most forms of Medicaid, Section 8 Housing Assistance under the Housing Choice Voucher Program, Section 8 Project-Based Rental Assistance, and certain other forms of subsidized housing. *Id.* at 41,501 (adopting 8 C.F.R. § 212.21(b)). Thus, the 2019 Rule included non-cash benefits in "public benefits," consistent with the definitions in 8 U.S.C. §§ 1611(c)(1)(B), 1621(c)(1)(B), which Congress adopted in 1996.

Appellees published their 2022 Rule on September 9, 2022, following notice and comment. 87 Fed. Reg. 55,472. The 2022 Rule defines aliens "likely at any time to become a public charge" to mean those who are "likely at any time to become primarily dependent on the government for subsistence, as demonstrated by either the receipt of public cash assistance for income maintenance or long-term institutionalization at government expense." 87 Fed. Reg. at 55,636 (adopting 8 C.F.R.

§ 212.21(a)). It also defines "public cash assistance for income maintenance" as "(1) Supplemental Security Income (SSI), 42 U.S.C. 1381 et seq.; (2) Cash assistance for income maintenance under the Temporary Assistance for Needy Families (TANF) program, 42 U.S.C. 601 et seq.; or (3) State, Tribal, territorial, or local cash benefit programs for income maintenance (often called ''General Assistance'' in the State context, but which also exist under other names)." *Id.* (adopting 8 C.F.R. § 212.21(b)).

The 2022 Rule also loosens requirements regarding how consular officers must evaluate affidavits of support by family sponsors. The 2022 Rule simply states that affidavits should be favorably considered in determining admissibility. 87 Fed. Reg. 55,472. This replaces the 2019 Rule's rigorous requirement for DHS officers to "consider the likelihood that the sponsor would actually provide the statutorily-required amount of financial support to the alien, and any other related considerations." 84 Fed. Reg. 41,292.

Appellees' stated rationale for these changes is to enhance aliens' access to public benefits. 87 Fed. Reg. at 55,473.

### III. Texas's Costs under the 2022 Rule

The 2022 Rule's loosening of immigration restrictions will have a predictable effect: more aliens will be admitted. An increase in the number of aliens in Texas will in turn have predictable effects on the State's fisc.

Texas provided evidence that it will bear costs related to four categories of public welfare spending. These were 1) driver's licenses, 2) incarceration, 3) education, and 4) healthcare. Texas substantiated its costs by submitting the declarations of

four civil servants, each with knowledge of one these areas of the State's public spending. ROA.484–96.

### 1. DRIVER'S LICENSES

Texas provides driver's licenses to foreign-born residents at a loss. For each non-citizen who requests a limited-term license, the Texas Department of Public Safety verifies their eligibility via Social Security Online Verification ("SSOLV") and the American Association of Motor Vehicle Administrators' ("AAMVA") Problem Drivers Pointer System ("PDPS") and, if applicable, the Commercial Driver License Information System ("CDLIS"). ROA. 485. These verification costs are not recouped by fees. The State of Texas currently pays $0.05 per customer for SSOLV and PDPS verification and a cost of $0.028 for CDLIS verification. ROA.484.

These costs add up. Each additional customer who obtains a limited-term driver license or personal identification certificate imposes a cost on DPS exceeding $33. *Id*. For an additional 10,000 driver license customers seeking the limited-term license available to foreigners, DPS would incur a biennial cost of approximately $3,681,692. *Id*.

### 2. INCARCERATION

The 2022 Rule also forces Texas to shoulder a significant fiscal burden from incarcerating additional aliens. Additional aliens in Texas means additional incarcerated aliens in Texas, including additional aliens on parole or mandatory supervision. "Whether incarcerating criminal aliens or having them on parole or mandatory supervision, TDCJ incurs costs." ROA.490.

According to the most recently available data, set forth in Appellant's Motion for Summary Judgment, the average cost of incarcerating an inmate who qualifies for reimbursement under the federal government's State Criminal Alien Assistance Program ("SCAAP") in Texas Department of Criminal Justice ("TDCJ") facilities was $77.49 per day from July 1, 2021, to June 30, 2022. ROA.489. During that period, TDCJ incarcerated 6,914 eligible inmates for a total of 2,019,635 days. The total cost of incarcerating these inmates for that period was $156,501,516. The SCAAP program has not reimbursed those costs. ROA.490. To the extent that the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well. *Id.*

TDCJ also incurs costs to keep aliens in custody or add them to mandatory parole or supervision programs when those aliens are not detained or removed by federal immigration authorities. *Id.* For Fiscal Year 2022, the average per-day cost of these programs for each inmate not detained or removed is $4.69, which would total $9,307,760, based on the number of inmates for the most recently completed SCAAP application. *Id.*

### 3. EDUCATION

Funding for Texas public schools is comprised of state and local funds. Funding entitlements are initially based on projections of student counts, attendance patterns, and other factors, and adjusted as actual data become available. ROA.492.

Each additional child who enrolls in a public school in Texas will cost the Texas Education Agency ("TEA") thousands of dollars per student per year. Most, if not

all, unaccompanied children ("UAC") qualify for Bilingual and Compensatory education funding. ROA.491. TEA incurs up to $11,781 per student who qualifies for this funding, so an increase in UACs would directly cause an increased cost to TEA. ROA.491.

The Foundation School Program serves as the primary funding mechanism for providing state aid to public schools in Texas. ROA.492. "Any additional UAC enrolled in and attending Texas public schools would increase the State's cost of the Foundation School Program over what it otherwise would have been." *Id.* Accordingly, TEA anticipates that that the total costs to the State of providing public education to UACs will rise in the future to the extent that the number of UACs enrolled in the State's public school system increases. ROA.492–93.

### 4. HEALTHCARE

Finally, the 2022 Rule has and will continue to burden the State of Texas with additional healthcare costs. In 2007, as part of the 2008–2009 General Appropriations Act, the Texas Legislature required HHSC to report the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. ROA.493. As part of this report, HHSC provided three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program ("FVP"); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage (a/k/a "CHIP Perinate"). ROA.494. In September 2022, HHSC updated the methodology for calculating the fraction of the Texas Medicaid Type Program 30 (Emergency Medicaid) clients and CHIP Perinate clients who are likely to be undocumented immigrants. *Id.*

For Emergency Medicaid and CHIP Perinate, the total estimated cost to the State each year is affected by (1) both the volume and cost of services provided; and (2) annual changes in the percentage of expenditures, matched by the federal government, that determine the State share of overall Medicaid and CHIP expenditures. ROA.496. HHSC has estimated the portion of Emergency Medicaid payments attributable to illegal aliens in Texas to be $116 million in CY 2019; $88.3 million in CY 2020; $95.6 million in CY 2021; and $72.2 million in CY 2022. ROA.494.

Texas CHIP Perinate Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. The total estimated cost to the State for CHIP Perinatal Coverage to undocumented immigrants residing in Texas was $11.1 million in CY 2019; $16.9 million in CY 2020; $25.8 million in CY 2021; and $30.9 million in CY 2022. ROA.495.

## IV. PROCEEDINGS IN THE DISTRICT COURT

Texas sued to challenge the 2022 Rule on January 5, 2023. The case proceeded to cross motions for summary judgment, which were fully briefed by December 22, 2023. On September 30, 2024, the district court granted Defendant-Appellees' motion for summary judgment and dismissed Texas's claims. ROA.802, 815 (Memorandum Opinion and Order); ROA.817 (Final Judgment).

The district court based its judgment entirely on its injury-in-fact analysis and did not reach the merits of Texas's claims. ROA.809 ("The Court need not reach the merits because Texas has failed to establish standing"). The lower court acknowledged Texas's standing theory—that an increase in admissions due to a laxer public charge rule will impose costs on state services—was consistent with the

Circuit's caselaw on state standing. *Id.* at 810–11 (noting "[t]hese fiscal-harm theories remain Fifth Circuit precedent"). However, it faulted Texas for "fail[ing] to submit evidence that an increase in aliens has occurred or is 'imminent' for Article III purposes." *Id.* at 811. Despite this blanket statement, the district court did consider one piece of evidence Texas presented on the Rule's likely impact on immigration levels, while ignoring confirmatory information that appears in the 2022 Rule's preamble. *Id.* at 812–13 (discussing adjustment application figures). Nonetheless, the court deemed Texas's evidence "speculative" and not directly probative because "Texas has not provided evidence that a single additional person was, or would be, granted admission into the country, much less Texas, under the 2022 Rule." *Id.* at 814.

The district court left other aspects of Texas's standing theory unaddressed. While the court briefly addressed Texas's special solicitude argument, it did so only to remark that special solicitude could not substitute for cognizable injury. Since the court concluded Texas had "not established an injury," it also found "Texas…lacks standing based on special solicitude." *Id.* at 815.

## V. Proceedings on Appeal

Texas appealed the district court's judgment on December 2, 2024. On appeal Texas asks the Court to review the trial court's determination that Texas was required to show the number of admitted aliens increased as a result of the 2022 Rule. Texas believes that the lower court's judgment departs from this Court's teaching that state Plaintiffs need not submit "highly specific" evidence to prove their standing to challenge major federal rulemaking. *MPP*, 20 F.4th at 928.

## Summary of the Argument

Texas has suffered, and will continue to suffer, harm because of the implementation of the 2022 Rule. The more aliens that are present in Texas, the more Texas must spend on public benefits. Texas has provided evidence to support its contentions that under the 2022 Rule, more aliens will enter Texas, and thus Texas will shoulder the financial burden of those additional aliens. This is in addition to DHS's own admission that the redefinition of "public charge" would increase States' costs of providing benefits to aliens.

The district court ruled that Texas had failed to show any evidence that a single additional person would be present in Texas because of the implementation of the 2022 Rule. ROA. 814. But Texas need not show highly specific, particularized evidence to demonstrate standing. *See MPP*, 20 F.4th at 971. Moreover, in a such a case challenging large-scale immigration policy, it is clear that by limiting the definition of a public charge, some controls to manage the "influx" of aliens is lost—inevitably resulting in an increase of aliens in the country and in Texas. *Id.* at 967.

Consequently, Texas has demonstrated an injury-in-fact, and has standing to challenge the Biden-era 2022 Rule.

## Standard of Review

Questions related to standing are reviewed de novo. *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 236 (5th Cir. 2010) (citation omitted). Review of summary judgment is also de novo, "applying the same standards as the district court." *Tex. State LULAC v. Elfant,* 52 F.4th 248, 252 (5th Cir. 2022) (citation omitted).

Findings of fact made by a district judge during a bench trial are reviewed for clear error. *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 294 (5th Cir.2009). "A finding is 'clearly erroneous' when there is no evidence to support it, or if the reviewing court, after assessing all of the evidence, is left with the definite and firm conviction that a mistake has been committed." *Baldwin v. Taishan Gypsum Co., Ltd.*, 742 F.3d 576, 584 (5th Cir.2014).

## ARGUMENT

### I. TEXAS HAS TRADITIONAL ARTICLE III STANDING.

The trial court erred in ruling that Texas lacks standing. The evidence in the record conclusively shows that Texas has met all requirements for traditional Article III standing. Therefore, the district court's dismissal was improper.

#### A. STANDING REQUIREMENTS

As the party invoking federal jurisdiction, Texas bears the burden to show that it has standing. *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015), as revised (Nov. 25, 2015). Texas must therefore show that it has suffered an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013). "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

**B. TEXAS HAS SUFFERED A CONCRETE AND PARTICULARIZED INJURY.**

Despite the trial court's ruling, ROA.814, Texas established an injury-in-fact as a direct result of the 2022 Rule that is both traceable to Appellees and is redressable by a favorable ruling. As a result, this Court should reverse the lower court's ruling.

Texas undertakes and incurs the costs of providing a wide range of services for admitted aliens present in Texas. Texas incurs extra costs when more aliens enroll in its benefits programs. Some of these costs accrue immediately while others are incurred five years after admission, depending on when aliens become eligible for certain benefits. Therefore, an increase in alien admissions will result in larger draws on Texas's public spending and thus higher costs to the State.

Texas submitted ample evidence of the costs it will face following an increase in alien admissions. These showings are made all the more poignant by the fact that the class of aliens who will be admitted due to the 2022 Rule's overly exclusive public charge standard are especially prone to require public services. Appellees admit as much when they use the term "chilling effects" when referring to the decision to disenroll or forego enrollment in public benefits—regardless of the reason or whether the individual is subject to public charge determinations. 87 Fed. Reg. 55,473 n.9. And the 2022 Rule repeatedly acknowledges that some of those disenrolling or foregoing enrollment *would be* subject to public charge determinations. *See e.g., id.* at 55,467.

The lower court determined that Texas failed to show that the 2022 Rule would increase alien admissions. ROA.814. But this is the predictable effect of a rule whose stated purpose is to narrow the scope of a barrier to admission.

1. **THE DISTRICT COURT REQUIRED EVIDENCE FOR STANDING THAT THE FIFTH CIRCUIT HAS HELD TO BE UNNECESSARY.**

At its core, the 2022 Rule drastically limits the definition of who is considered a "public charge" for the purposes of immigration. *See* 87 Fed. Reg. at 55,636 (adopting 8 C.F.R. § 212.21(a)–(b)). And, because the 2022 Rule reduces the number of aliens who will be inadmissible public charges, the predictable effect of the 2022 Rule will be an increase in the number of aliens present in Texas, with a resulting increase of Texas's costs. *See Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (standing exists if the evidence shows "that third parties will likely react in predictable ways" to the defendants' challenged conduct).

The trial court erroneously concluded that "Texas has not provided any evidence that a single additional person was, or would be, granted admission into the country, much less Texas, under the 2022 Rule." ROA. 814. But this Court has expressly rejected arguments that state plaintiffs must provide highly specific, particularized evidence to establish standing to challenge major federal rulemaking. In the 2021 MPP case, this Court explained:

> The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. Tellingly, however, it offers no hint as to how Texas could make that showing—nor why we should require it to do so. Imagine Texas had produced copies of driver's license applications from paroled aliens. Would that have counted as evidence that Texas had, in the Government's words, "issued a single additional driver's license as a result" of MPP's termination? Of course not: There would always remain some possibility that *any given parolee* would have been paroled even under MPP. MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such

big-picture evidence. There is nothing "conjectural" or "hypothetical" about that.

*MPP*, 20 F.4th at 971. And "[e]ven if the termination of MPP played *no* role in the increasing number of migrants, the lack of MPP as a tool to manage the influx means that more aliens will be released and paroled into the United States as the surge continues to overwhelm DHS's detainment capacity." *Id.* at 967 (emphasis in original).

Here, the District Court's ruling contradicts this Court's holding in *MPP* that even if a challenged agency action does not itself increase the number of aliens paroled into the country, Plaintiff States can still establish standing. *See id.* at 968 ("even if the Government were correct that MPP was an ineffective deterrent, the fact remains that, according to both the record and the Government's own brief, MPP's termination drastically increases the proportion of incoming aliens who are paroled rather than returned to Mexico. And it is precisely that increase in paroles that causes the States' harms."); *see also Texas v. Biden*, 554 F.Supp.3d 818, 837 (N.D. Tex. 2021) (Kacsmaryk, J.) ("Defendants' termination of MPP necessarily increases the number of aliens present in the United States regardless of whether it increases the absolute number of would-be immigrants. MPP authorized the return of certain aliens to Mexico. Without MPP, Defendants are forced to release and parole aliens into the United States because Defendants simply do not have the resources to detain aliens as mandated by statute.").

Much the same as in *MPP*, the 2022 Rule will increase the number of aliens in Texas. If the definition of who is considered a "public charge" is narrowed, fewer individuals would be inadmissible public charges, and thus more individuals would

be allowed entry into the country. While Texas could not definitively predict the future, the converse was certainly true. Appellees' own data show an 18% drop in the number of applicants seeking to change their status between fiscal year 2018 and 2020. This decline in applications, even accounting for the pandemic in the latter half of fiscal year 2020, is directly attributable in whole or part to the 2019 Rule. 87 Fed. Reg. 55,505.

Appellees further argued, and the district court agreed, that Texas lacked standing because it could not identify anyone who was admitted under the 2022 Rule who would have been excluded under the 2019 Rule. ROA.576–79, ROA.814. But this contention ignores that applicants who *would have* been denied on public charge grounds likely chose not to apply for a change in status in the first place because they could use objective criteria contained in the 2019 Rule to determine that their applications would be denied. In other words, the best measure for the number of individuals who likely would have been denied a change in immigration status on public charge grounds under the 2019 Rule is the overall change in the number of applicants before and after Defendants proposed the 2019 Rule on October 10, 2018. 87 Fed. Reg. 55,602. And again, the inadmissibility of public charges is a tool in the immigration toolbelt. If it diminishes, it is incontrovertible that immigration will increase and subsequently lead to an increase in aliens in Texas. *See MPP*, 20 F.4th at 967.

This Court previously rejected an attempt by DHS to use overall immigration numbers to defeat standing relating to a particular agency action. In *Texas v. United States*, 40 F.4th 205 (5th Cir. 2022), the court faced a challenge where the States' injuries were based on agency action that reduced federal arrests of certain criminal

aliens. Defendants challenged Texas's standing by pointing to "various statistics show[ing] an increase in arrests and expulsions year-over-year," and "the percentage of enforcement actions involving noncitizens increase[ing] as compared to the same time frame in fiscal year 2020." *Id.* at 218 n.6.

The Fifth Circuit rejected the relevance of these overall numbers: "[F]or purposes of standing, the inquiry is whether the [challenged agency action] caused Texas to have to incur additional financial, law enforcement, and welfare costs, not whether there were generally more enforcement actions year-over-year in the midst of a historic immigration crisis." *Id.*

There is therefore no doubt that Texas has suffered and will continue to suffer injury. A narrowing of the definition of who is considered a public charge will in turn lead to increased alien presence in Texas. And any increase will cause additional cost, or injury, to Texas.

### C. THE DISTRICT COURT COMMITTED CLEAR ERROR BY FAILING TO CONSIDER UNDISPUTED EVIDENCE THAT THE FINAL RULE WILL INJURE TEXAS.

Texas submitted evidence sourced from Appellees' own rulemaking that the Final Rule would increase the cost to States of providing benefits to aliens compared to the 2019 Rule that it replaced. In the preamble to the Final Rule, Appellees conducted a cost analysis that estimated the number of aliens who would opt out of public benefits if a regulation substantially similar to the 2019 Rule were retained. 87 Fed. Reg. 55620–21; 55629–31. These projections estimated a percentage of ad-

mitted aliens who would either disenroll from public welfare programs or forego enrollment to avoid falling under a public charge determination. Appellees conducted these estimates for the replaced 2019 Rule and concluded that the stricter 2019 Rule would result in disenrollment or foregone enrollment between 3.1% and 14.7%. Id. Applying these numbers, Appellees estimated the 2019 Rule would save $6.25 billion annually on the high end and $1.6 billion annually on the low end.

As part of its projections, Appellees estimated the number of aliens who would disenroll from Medicaid. *Id.* at 55631. Their median estimate found that disenrollment would reach at least 294,241 people. *Id.* The same median estimate also found that 439,671 people would disenroll from SNAP. *Id.* Both Medicaid and SNAP are concurrently funded by state and federal sources. So, disenrollment from these programs indisputably creates savings for the States.

Elsewhere in the preamble Appellees state that the Final Rule will expand alien access to public resources as compared to the 2019 Rule. "DHS acknowledges that the 2019 Final Rule caused fear and confusion among U.S. citizens and noncitizens and had a significant chilling effect on the use of public benefits by noncitizens, even among those who were not subject to the rule and with respect to public benefits that were not covered by the rule." 87 Fed. Reg. at 55,505. While Appellees emphasized their belief that many of the aliens prone to disenrollment could not be subject to a public charge determination, they never denied that some disenrollment is attributable to aliens who would otherwise qualify as public charges. 87 Fed. Reg. 55478-85 (noting for various provisions added by the Final Rule "the final rule could lead to an increase in transfer payments," for several populations of aliens). *See also Cook*

*Cty. v. Mayorkas*, 340 F.R.D. 35, 42 (N.D. Ill. 2021), *aff'd sub nom. Cook Cty. v. Texas*, 37 F.4th 1335 (7th Cir. 2022), *cert. denied sub nom. Texas v. Cook Cty.*, 143 S. Ct. 565 (2023) ("DHS admits that, without the [2022] Rule, some number of additional noncitizens will become eligible for public benefits by achieving lawful permanent resident status. A predictable consequence of that eligibility is that those noncitizens will obtain public benefits").

These facts were before the district court, *see* ROA.465–66 (Plaintiff's MSJ discussing disenrollment figures); ROA.744 (Plaintiff's Opposition and Reply discussing the same), but entirely absent from the court's standing analysis. Moreover, Defendant-Appellees did not dispute assertions their own rulemaking made that the Final Rule would lead to lower disenrollment relative to the 2019 Rule. ROA.578–80 (Defendants' XMSJ an Opposition contesting Texas's use of disenrollment data as beyond the "zone of interests" but not denying its veracity). Accordingly, at least one set of facts showing costs to Texas from the Rule was undisputed before the trial court.

The district court clearly erred by failing to consider an undisputed basis for Texas's injury-in-fact. Appellees did not disagree at the trial level that the Final Rule would lead to lower disenrollment rates than the 2019 Rule nor that lower disenrollment means higher public benefit spending for both the federal government and the States. Since fiscal harm due to higher spending needs is a textbook cognizable injury, *see e.g., Texas v. United States*, 40 F.4th at 216, the lower court should have affirmed Texas's standing. That it did not is clear error.

### D. Texas's injury meets the traceability and redressability requirements for Article III standing.

A plaintiff bearing the burden to demonstrate standing must also show that his injury is "fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 149 (2010) (citing *Horne v. Flores,* 557 U.S. 433, 445 (2009)); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

*First*, Texas's injuries are "fairly traceable" to Appellees' actions because the repeal of the 2019 Rule and the implementation of the 2022 Rule will inarguably result in an increased number of aliens present in Texas and an increased number of aliens enrolling in benefit programs. In fact, Appellees concede in the 2022 Rule itself that there is a *positive correlation* between the implementation of the 2019 Rule and individuals disenrolling or foregoing enrollment in public benefits. *See, e.g.*, 87 Fed. Reg. 55,505 ("DHS acknowledges that the 2019 Final Rule caused fear and confusion among U.S. citizens and noncitizens and had a significant chilling effect on the use of public benefits by noncitizens, even among those who were not subject to the rule and with respect to public benefits that were not covered by the rule."). This causal connection was so compelling that Appellees overhauled national immigration law to limit the aliens inadmissible as public charges. *See id.* at 55,579 ("This public charge rule intends to administer the statute faithfully and fairly, while avoiding predictable adverse and indirect consequences such as disenrollment or forgone enrollment by individuals who would not be subject to the public charge ground of inadmissibility in any event.").

There can be no doubt, therefore, about the traceability of Appellees' actions to Texas's injury. Under the 2019 Rule, fewer aliens enrolled in public benefits, and others sought to disenroll from public benefits. The rescission of the 2019 Rule and subsequent implementation of the 2022 Rule will therefore have the opposite effect, leading to more costs for the state of Texas.

*Second*, this injury is redressable by a favorable ruling that vacates the 2022 Rule. *Monsanto Co.*, 561 U.S. at 149. Such a ruling would eliminate the unlawful amendments made to the Code of Federal Regulations in the 2022 Rule and restore the provision as adopted by the 2019 Rule. This would restore the pre-2022 Rule status quo and limit Texas's expenditures on public benefits for aliens. Texas's injury is therefore entirely redressable by vacatur of the 2022 Rule.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's grant of summary judgment.

February 20, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

Respectfully submitted,

/s/ Ryan G. Kercher
RYAN G. KERCHER
Chief, Special Litigation Division
ryan.kercher@oag.texas.gov

ZACHARY L. RHINES
Special Counsel
zachary.rhines@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
OF TEXAS
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Telephone: (512) 463-2100

COUNSEL FOR PLAINTIFF - APPELLANT

## CERTIFICATE OF SERVICE

On February 20, 2025, this motion was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Ryan G. Kercher
RYAN G. KERCHER
Special Counsel

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains **6,217** words, excluding the parts exempted by Rule 27(a)(2)(B); and (2) the typeface and type-style requirements of Rules 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

*/s/Ryan G. Kercher*
RYAN G. KERCHER
Special Counsel